

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-21-00310-CV

**IN THE INTEREST OF J.K.N.G.** and A.K.A.F.M., Children

From the 288th Judicial District Court, Bexar County, Texas
Trial Court No. 2019-PA-02080
Honorable Linda A. Rodriguez, Judge Presiding[1]

Opinion by:    Luz Elena D. Chapa, Justice

Sitting:       Rebeca C. Martinez, Chief Justice
               Luz Elena D. Chapa, Justice
               Liza A. Rodriguez, Justice

Delivered and Filed: March 9, 2022

AFFIRMED

Jenna[2] appeals the trial court's order terminating her parental rights to J.K.N.G. and A.K.A.F.M. She challenges the sufficiency of the evidence to support the trial court's grounds for termination and the best-interest finding. We affirm.

---

[1] The Honorable Cynthia Marie Chapa is the presiding judge of the 288th Judicial District Court. The Honorable Linda A. Rodriguez presided over the trial and signed the order of termination.

[2] To protect the identity of the minor children, we refer to appellant by a fictitious name and to the children by their initials. *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8.

**BACKGROUND**

The Department of Family and Protective Services filed an original petition on October 11, 2019. In the petition, the Department sought appointment as temporary managing conservator for the children and termination of Jenna's parental rights.[3]

On July 9, 2021, the case proceeded to a bench trial, and the evidence consisted of live testimony from three witnesses and no exhibits. The trial court found by clear and convincing evidence the grounds for termination set forth in Texas Family Code sections 161.001(b)(1)(D), (E), (N) and (O). The court also found by clear and convincing evidence that terminating Jenna's parental rights was in the best interest of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). Based on its findings, the court terminated Jenna's parental rights to the children and appointed the Department as their permanent managing conservator.[4]

Jenna timely appealed the trial court's order. She challenges the statutory grounds for termination along with the trial court's best-interest finding.

**STANDARD OF REVIEW AND APPLICABLE LAW**

A judgment terminating parental rights must be supported by clear and convincing evidence. TEX. FAM. CODE § 161.001(b). To determine whether this heightened burden of proof was met, we employ a heightened standard of review to decide whether a "factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). "This standard guards the constitutional interests implicated by termination, while retaining the deference an appellate court must have for the factfinder's role." *In re O.N.H.*, 401 S.W.3d 681, 683 (Tex. App.—San Antonio 2013, no pet.). Under this standard,

---

[3] The Department amended its petition the same day to reflect that the children had been taken into the Department's possession in compliance with Texas Family Code § 262.104.

[4] The trial court also terminated the parental rights of the children's fathers; they do not appeal.

the trial court is the sole judge of the weight and credibility of the evidence, including the testimony of the Department's witnesses. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). To give proper deference to the factfinder's role, we must assume it resolved disputed evidence in favor of its findings if a reasonable factfinder could have done so. *Id.* at 344.

In our legal sufficiency review, we review the evidence in the light most favorable to the finding and disregard all evidence that a reasonable factfinder could have disbelieved or found incredible. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). However, we must consider undisputed or uncontradicted evidence in our review, even if that evidence does not support the trial court's finding. *Id.* When conducting a factual sufficiency review, we consider the entire record. *Id.* Rather than disregard disputed evidence that a reasonable factfinder could not have credited in favor of the finding, we must determine whether, in light of the entire record, that evidence "is so significant that a factfinder could not reasonably have formed a firm belief or conviction" that the finding was true. *Id.*

THE EVIDENCE PRESENTED AT TRIAL

## A. Law Enforcement's Concern for the Children Prompted the Department's Involvement

Jennifer Ziarmal, a Department caseworker, testified Jenna contacted law enforcement in October 2019 to report she was sexually assaulted and subjected to sex trafficking in her neighborhood. Jenna conceded she made one or two reports of sexual assault while her children were in her possession. About that same time period, three-year old J.K.N.G. was observed wandering around outside Jenna's apartment unsupervised. Ziarmal did not specify when or who observed J.K.N.G. wandering around outside.

Law enforcement expressed its concern to the Department about the well-being of the children and Jenna's mental health. Jenna testified J.K.N.G. wandered out of the apartment

because the deadbolt to the apartment front door was broken, and the apartment complex management refused to fix it. She tried, without success, to fix it herself with a doorknob safety device for children, but the device did not fit over the doorknob. Jenna was in another room when J.K.N.G. wandered outside, and she did not hear the door open because of the sound coming from the television. She further testified J.K.N.G. had never done that before and agreed had she purchased and installed a chain lock, J.K.N.G. could not have wandered outside.

According to Ziarmal, the Department established family-based services for Jenna. Jenna was initially participating, but eventually stopped and the Department filed a petition for removal. The children were removed from Jenna's care on October 11, 2019.

## B. Jenna Did Not Comply with the Service Plan

Ziarmal testified a service plan was created for Jenna. The plan required Jenna to complete a drug assessment and drug testing, comply with mental health treatment, and engage in counseling. She testified she reviewed Jenna's plan requirements with her and explained what could happen if she did not engage in services.

### 1. Drug Testing and Substance Abuse Treatment

Ziarmal testified Jenna was not in compliance with her service plan at the time of trial. She testified Jenna admitted she used marijuana, and the evidence before the trial court showed Jenna also used methamphetamines. Jenna testified she had not taken methamphetamines in fourteen years, but she was "forced to do it" under threat of violence. Although Jenna did not complete approximately ten of twenty-three required drug tests, Ziarmal testified Jenna's most recent drug test—a hair follicle test taken six weeks before trial—was negative. Jenna testified she had been clean since October 2020.

As part of her substance abuse treatment plan, Jenna completed a drug assessment that resulted in a recommendation that she seek outpatient treatment. Ziarmal testified Jenna asked if

she could be treated for substance abuse by her therapist, Delilah Martinez. Ziarmal agreed but testified Martinez "unsuccessfully discharged" Jenna a few weeks before trial.

Jenna disputed Ziarmal's testimony. She denied she was unsuccessfully discharged by Martinez and testified she missed only a few sessions with her. Jenna further testified Martinez asked her at their last appointment to inform Martinez whether she was court-ordered to continue counseling. Jenna also denied she was seeing Martinez for substance abuse treatment. She testified she was being seen by her case manager, "Javier," at the Center for Health Care Services (CHCS) for substance abuse treatment. According to Jenna, she began her sessions with Javier in January 2021. She testified she and Javier briefly addressed her substance abuse "verbally"—without a substance abuse treatment plan—in their first few sessions and stopped addressing her substance abuse because she no longer abused any drugs.

### 2. Mental Health Treatment

Ziarmal testified Jenna completed a psychiatric evaluation. However, six months before trial, CHCS notified her that Jenna was only pursuing mental health treatment periodically "on an emergency basis." Ziarmal testified she sought to determine whether Jenna had engaged in treatment but needed to secure a new release from Jenna for current medical records. Between March and June 2021, she repeatedly tried to secure Jenna's signature for a release, but Jenna refused to sign one.

Jenna testified she did not complete mental health treatment because a psychiatrist told her she did not need treatment. Initially, a psychiatrist concluded Jenna needed medication.[5] However, Jenna testified she sought a second opinion, and the second psychiatrist had no concerns about her

---

[5] Jenna did not remember the psychiatrist's name.

mental health and did not prescribe medication.[6] Jenna testified that after that evaluation, there was "no reason" for her to see a psychiatrist.

### C. Jenna Remained in Her Apartment After the Children Were Removed and Was Subjected to Additional Violence, But She Eventually Relocated and Secured Employment

After the children were removed from her possession, Jenna remained in the same apartment for an additional year. During that time, Jenna testified she was subjected to additional incidents of sexual assault and sex trafficking. Jenna admitted her first apartment was located in a neighborhood known for "a lot of drugs" and "a lot of bad influences." In October 2020, Jenna moved to a new apartment in a different neighborhood. Ziarmal visited the new apartment approximately three months before trial. She testified this apartment had adequate space for the children to sleep. However, Jenna denied her access when Ziarmal attempted to visit the apartment closer to trial. Jenna testified that since the move, she has had only one issue with a neighbor harassing her "a little bit." Jenna also testified she could now keep herself and her children safe.

As far as employment, Jenna testified she was unemployed when she had the children because she had endured a domestic violence injury. She financially provided for the children through Temporary Assistance for Needy Families. Jenna remained unemployed until January 2021, when she began working for Dairy Queen. After two months, Jenna left Dairy Queen for McDonald's. She testified she earned $9.75 per hour at McDonald's. She further testified she believed that income would allow her to pay for electricity, and provide for her children and unborn child.[7] She indicated she could also supplement her income with food stamps and provide healthcare for the children through Medicaid.

---

[6] Jenna did not remember the second psychiatrist's name.

[7] Jenna was pregnant at the time of trial. Jenna further testified she also paid child support for her five other children.

**D. The Children Were Placed with Jenna's Mother, and Jenna Was Unhappy with the Placement**

In October 2019, the Department placed the children with Jenna's mother, Charlotte Roberts. Ziarmal testified Roberts was meeting their basic needs, and it was a safe placement. She emphasized Roberts had specifically been able to meet the needs of four-year old J.K.N.G.—who has autism and ADHD—by providing him with a structured environment. The Department had no concerns about two-year old A.K.A.F.M.'s physical or emotional development. Ziarmal testified the children were doing well in Roberts's care, and it was in their best interest to remain with her.

Jenna testified she did not like how Roberts cared for the children. She testified she had potty-trained J.K.N.G., but Roberts allowed him to regress. Jenna also testified she did not want the children to remain with Roberts because Roberts had not been a good parent to her. Jenna further testified she and her children lived with Roberts for a brief period. During that time, Jenna learned Roberts's boyfriend was a registered sex offender. However, Roberts refused to believe it. She further testified Roberts's boyfriend inappropriately touched her on one occasion, but Roberts blamed Jenna for the incident. Jenna felt her strained relationship with Roberts would make it hard for her to maintain her relationship with the children without a court order. She testified because of the bond she had with the children it was in their best interest, especially J.K.N.G., to maintain a relationship with her.

**E. Jenna Missed Many Visitations, But She Had Appropriate Visits When She Attended**

The evidence before the trial court showed Jenna missed approximately half of the visits with the children over the twenty-one months of the case. Jenna testified she missed early visits because those took place during the time she was assaulted and trafficked. The evidence before the trial court showed Jenna did not participate in virtual visits when they began in March 2020. Jenna testified she was not capable of using the technology required for virtual visits but conceded

she did not ask for help; she made a few telephone calls to the children instead. She further testified she missed recent visits when she was not feeling well. When asked whether she saw her other five children, Jenna testified A.K.A.F.M.'s paternal grandmother, who had custody of the children, did not allow her to see them despite a court order granting her visitation.

When Jenna visited J.K.N.G. and A.K.A.F.M., the evidence before the trial court shows the visits were appropriate. She played with the children and provided them with a few meals. Ziarmal testified they seemed happy with her and were not afraid of her; she also testified they were not overly attached to or bonded with Jenna. Jenna disputed this, testifying they had a strong bond. She further testified that during her visits she read books, talked to the children, and went over numbers and colors with J.K.N.G. She also provided them with toys, diapers, and blankets.

Ziarmal testified she did not think Jenna would be able to parent or meet the emotional needs of the children partly because she did not appreciate the potential for danger. She conceded Jenna was not required to complete a parenting class but was concerned by the number of missed visits and Jenna's lack of flexibility to accommodate changes in scheduling visits on short notice. She further testified Jenna was not reasonable about J.K.N.G.'s potty-training in spite of his developmental delays. She testified she believed it was in the best interest of the children to terminate Jenna's parental rights.

## LEGAL AND FACTUAL SUFFICIENCY OF THE EVIDENCE TO SUPPORT TERMINATION PURSUANT TO TEX. FAM. CODE § 161.001(b)(1)(D)

Jenna argues the evidence was legally and factually insufficient to support the trial court's termination of her parental rights pursuant to grounds (D), (E), (N), (O), and (P). When a parent challenges findings under subsection (D) and/or subsection (E), we must address those grounds even if there are other predicate grounds because of the potential future consequences for parental rights to another child. *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019).

In order to terminate parental rights pursuant to subsection (D), the Department must prove by clear and convincing evidence that the parent knowingly placed the child in or allowed the child to remain in conditions or surroundings that endangered the child's physical or emotional well-being. *See In re I.N.D.*, No. 04-20-00121-CV, 2020 WL 2441375, at *3 (Tex. App.—San Antonio May 13, 2020, pet. denied) (mem. op.). "Conditions or surroundings" establishing endangerment include "[i]nappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis." *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.). "Endanger," as used in section 161.001(b)(1)(D), means to expose to loss or injury or to jeopardize a child's emotional or physical health. *See Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) (construing predecessor statute). An environment that endangers the child may be created by the physical living conditions in the child's home or by the conduct of a parent living in the home. *In re R.S.-T.*, 522 S.W.3d 92, 108–09 (Tex. App.—San Antonio 2017, no pet.).

A parent knowingly places or allows a child to remain in an endangering environment when the parent is aware of the potential danger but disregards it. *M.R.J.M.*, 280 S.W.3d at 502. Thus, a child may be endangered when the home environment creates a potential for emotional or physical injury; the injurious conduct does not need to be directed at the child and the child does not need to suffer injury for the requirements of subsection (D) to be met. *Boyd*, 727 S.W.2d at 533; *I.N.D.*, 2020 WL 2441375, at *3.

The relevant period for review of conduct and environment supporting termination under statutory ground D is the time period before the Department removes the child. *R.S.-T.*, 522 S.W.3d at 109 (citing *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009)). Subsection (D) permits termination based upon only a single act or omission. *Id.*

It is undisputed that Jenna reported to law enforcement she was subjected to sex trafficking and made "one or two" reports of being sexually assaulted while she was in possession of her children. It is also undisputed Jenna knew she could not lock her door because of a broken deadbolt, and J.K.N.G. was found wandering around alone outside the family apartment located in a neighborhood where Jenna acknowledged "there was a lot of drugs" and "a lot of bad influences." Jenna further testified she knew had she installed a chain lock, J.K.N.G. would not have wandered outside. The record shows J.K.N.G. was three years old at the time and had autism and ADHD. The record also shows law enforcement contacted the Department about its concerns for the children and for Jenna's mental health before removal. On this record, we hold the trial court could have reasonably formed a firm belief or conviction that Jenna knowingly placed or allowed her children to remain in conditions or surroundings that endangered their physical or mental well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(D); *J.O.A.*, 283 S.W.3d at 346 (trial court is sole judge of weight and credibility of evidence, including testimony of Department's witnesses). We therefore hold the evidence is both legally and factually sufficient to support the trial court's endangerment finding under subsection (D).

### LEGAL AND FACTUAL SUFFICIENCY OF THE EVIDENCE TO SUPPORT TERMINATION PURSUANT TO TEX. FAM. CODE § 161.001(b)(1)(E)

Under section 161.001(b)(1)(E), the term endangerment has the same definition as in section 161.001(b)(1)(D), but the grounds of subsections (D) and (E) are otherwise different. *See Boyd*, 727 S.W.2d at 533.

In order to terminate parental rights pursuant to subsection (E), the Department must prove by clear and convincing evidence that the parent engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the child's physical or emotional well-being. TEX. FAM. CODE § 161.001(b)(1)(E). Termination under subsection (E) must be based on

more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *In re J.W.*, 152 S.W.3d 200, 205 (Tex. App.—Dallas 2004, pet. denied). The course of conduct may include both the parent's actions and failures to act. *In re M.J.M.L.*, 31 S.W.3d 347, 351 (Tex. App.—San Antonio 2000, pet. denied). Scienter is not required for a parent's own acts or omissions; proof of the parent's knowledge is required only when the allegation is that the parent placed the child with others who endangered the child. *In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at *4 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied) (mem. op.).

The Department does not have to prove the parent directed the endangering conduct at the child, it was done in the presence of the child, or the parent caused an actual injury or threat of injury to the child. *Boyd*, 727 S.W.2d at 534; *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616-17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *M.J.M.L.*, 31 S.W.3d at 351. The danger to the child's well-being may be inferred from the nature of the parent's misconduct alone. *Boyd*, 727 S.W.2d at 534. Thus, in considering whether a course of conduct that endangers the child's physical or emotional well-being has been established, the trial court may consider evidence of the parent's conduct both before and after the child's birth, including conduct occurring after the child was removed from the parent's care. *K.J.G.*, 2019 WL 3937278, at *4; *Walker*, 312 S.W.3d at 617.

Jenna argues she was protective of the children and did not endanger them and proved this by reporting her sexual assaults and sex trafficking to law enforcement. However, Jenna did not remove the children from this endangering environment; the Department did. And Jenna decided to remain in that same environment for a full year after the children's removal. During that time, she made additional reports of sexual assault and sex trafficking and was subjected to forced drug use. Jenna's conduct posed a dangerous risk to the children's physical and emotional well-being

by remaining in an endangering environment. Jenna's decision to remain in this environment until October 2020—a year after the children were removed—was a voluntary, deliberate, and conscious course of conduct and we may infer danger to the children from it. *See Boyd*, 727 S.W.2d at 534; *J.W.*, 152 S.W.3d at 205.

Based on this evidence, the trial court could have reasonably formed a firm belief or conviction about the truth of the Department's allegation that termination of Jenna's parental rights on the grounds of subsection (E) was proper because Jenna failed, for a year, to remove herself from an environment that endangered the physical and emotional well-being of her children. We therefore hold the evidence is both legally and factually sufficient to support the trial court's finding under section 161.001(b)(1)(E) of the Texas Family Code.

Because a finding of only one predicate ground is necessary and because we conclude the evidence is sufficient to support the trial court's finding under subsections (D) and (E), we do not address the trial court's findings under subsections (N) or (O). *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

### LEGAL AND FACTUAL SUFFICIENCY OF THE EVIDENCE TO SUPPORT THE TRIAL COURT'S BEST-INTEREST FINDING

Jenna argues the evidence was legally and factually insufficient to support the trial court's best-interesting finding. To terminate parental rights, a trial court must find by clear and convincing evidence that termination is in the child's best interest. TEX. FAM. CODE § 161.001(b). Under Texas law, there is a strong presumption the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). However, a court must also presume "the prompt and permanent placement of the child in a safe environment is . . . in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a). In making a best-interest

determination, the factfinder looks at the entire record and considers all relevant circumstances. *See C.H.*, 89 S.W.3d at 27-29.

In determining the best interest of a child, a court should consider the factors set out in section 263.307 of the Family Code.[8] Courts also apply the non-exhaustive *Holley* factors. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). Those factors include: (1) the desires of the child; (2) the present and future emotional and physical needs of the child; (3) the present and future physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans held by the individuals seeking custody; (7) the stability of the home of the parent and the individuals seeking custody; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.*

Not every factor must be proven for a trial court to find that termination is in the child's best interest. *C.H.*, 89 S.W.3d at 27. Instead, we must consider "the totality of the circumstances in light of the *Holley* factors" to determine whether sufficient evidence supports the challenged finding. *In re B.F.*, No. 02-07-334-CV, 2008 WL 902790, at *11 (Tex. App.—Fort Worth Apr. 3, 2008, no pet.) (mem. op.).

---

[8] These factors include: the child's age and physical and mental vulnerabilities; the frequency and nature of out-of-home placements; the magnitude, frequency, and circumstances of the harm to the child; whether the child has been the victim of repeated harm after intervention by the department; whether the child is fearful of returning to the child's home; the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; whether there is a history of abusive conduct by the child's family or others who have access to the child's home; whether there is a history of substance abuse by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; whether the child's family demonstrates adequate parenting skills; and whether an adequate social support system consisting of an extended family and friends is available to the child. *See* TEX. FAM. CODE § 263.307(b).

## A.  The Present and Future Physical Danger to the Children

The record shows Jenna knew she lived in an apartment located in an unsafe neighborhood at the time of the children's removal. Although Jenna knew she could have fixed the broken lock to her front door by installing a chain lock, she failed to do so. As a result, J.K.N.G., a three-year old child with autism and ADHD, wandered outside unsupervised into a dangerous environment. Jenna remained in this environment until October 2020—an additional year after the children were removed—and reported additional sexual assaults, sex trafficking, and forced drug use. Although Jenna could not be blamed for the crimes of others, Jenna's failure to take action to remove herself from this environment shows she did not appreciate the danger this unsafe environment posed to her children. This factor weighs strongly in favor of the trial court's best-interest finding.

## B.  The Desires of the Children

At the time of trial, J.K.N.G. was four years old and A.K.A.F.M. was nearly three years old. When children are too young to express their desires, the factfinder may consider whether the children have bonded with their caregivers, are well-cared for by them, and have spent minimal time with a parent. *See In re N.J.D.*, No. 14-17-00711-CV, 2018 WL 650450, at *6 (Tex. App.—Houston [14th Dist.] Feb. 1, 2018, pet. denied) (mem. op.). Ziarmal testified the children's maternal grandmother, Charlotte Roberts, had been meeting their needs in a safe environment since they were placed with her in October 2019. She specifically observed Roberts had been able to meet the needs of J.K.N.G. by providing him with structure. A.K.A.F.M. was doing well too, and the Department had no concerns about her development. Ziarmal testified it was in the children's best interest to remain with Roberts. Jenna, on the other hand, testified Roberts was not a good placement for the children based on her own experience growing up with Roberts and later living in Roberts's home along with her other children. Jenna also testified she believed Roberts was not a good placement because she permitted J.K.N.G. to regress in his potty-training.

Although Jenna visited the children regularly in the final few months before trial, she missed approximately half of the visits with the children. She testified she was unable to attend because for much of the time she was subjected to sexual assault, sex trafficking, and could not use virtual visit technology. When Jenna did visit the children, however, the visits were appropriate. Ziarmal and Jenna disputed whether there was a bond between Jenna and the children. The trial court is permitted to reconcile any disputed evidence in light of the entire record. This factor weighs in favor of the trial court's best-interest finding.

### C. The Stability of Jenna's Home and Employment and Her Ability to Provide for the Present and Future Needs of the Children

The evidence before the trial court shows Jenna did not have a stable home. Although Jenna moved to what she considered an apartment in a safer neighborhood in October 2020, she resided there less than half the time the case was pending. Before moving to the new apartment, Jenna remained in the old apartment for one year after the children were removed. *See J.O.A.*, 283 S.W.3d at 346 (evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of irresponsible choices).

Jenna was unemployed when she had possession of J.K.N.G. and A.K.A.F.M. She remained unemployed for an additional fourteen months after their removal. In January 2021, Jenna took a job working at Dairy Queen and left for McDonald's two months later. *See id*. At the time of trial, Jenna was still employed at McDonald's. She testified her $9.75 hourly wage was enough to pay the electric bill, provide for child support for her five other children, and care for J.K.N.G., A.K.A.F.M., and her unborn child. These factors weigh slightly in favor of the trial court's best-interest finding.

**D. Jenna Failed to Comply with Her Mental Health Treatment Requirement**

Jenna underwent a psychiatric evaluation but did not consistently seek mental health treatment through January 2021. Jenna testified she saw a psychiatrist six months before trial. Because Jenna disagreed with the psychiatrist's assessment that she take medication, Jenna testified she sought a second opinion from a different psychiatrist. The second psychiatrist had no concerns about her mental health and did not require her to take medication, so Jenna saw no reason to treat her mental health any further. However, Jenna refused to sign a release allowing Ziarmal to review her medical records reflecting this medical history. *See O.N.H.*, 401 S.W.3d at 687 (noncompliance with service plan is probative of child's best interest). This factor weighs slightly in favor of the trial court's best-interest finding.

**E. Jenna Failed to Comply with her Substance Abuse Treatment Requirement**

Although the evidence before the trial court showed Jenna's latest drug test was negative, Jenna missed more than half of her required drug tests and admitted to using marijuana. *See J.O.A.*, 283 S.W.3d at 346; *O.N.H.*, 401 S.W.3d at 687.

Jenna did seek treatment for substance abuse. The evidence, however, is disputed regarding who Jenna saw for this treatment. Ziarmal testified Jenna was seeing her therapist, Delilah Martinez, for treatment. She further testified Martinez unsuccessfully discharged Jenna, but Jenna testified Martinez did not unsuccessfully discharge her. She further testified she was seeing her case manager Javier for substance abuse, not Martinez. Jenna explained Javier treated her substance abuse "verbally" without a treatment plan during a few early sessions with him. She further explained there had been no substance abuse treatment thereafter because she did not need it. Again, the trial court is permitted to reconcile any disputed evidence in light of the entire record. This factor weighs in favor of the trial court's best-interest finding.

Considering all the relevant circumstances, the trial court could have reasonably formed a firm belief or conviction that termination of Jenna's parental rights was in the children's best interest. *See J.F.C.*, 96 S.W.3d at 266-67. We further conclude any disputed evidence, viewed in light of the entire record, could have been reconciled in favor of the trial court's best-interest finding or was not so significant that the trial court could not have reasonably formed a firm belief or conviction that termination was in the children's best interest. We therefore hold the evidence is legally and factually sufficient to support the trial court's best-interest finding. *See* TEX. FAM. CODE § 161.001(b)(2).

### CONCLUSION

We affirm the trial court's order of termination.

Luz Elena D. Chapa, Justice